**Hideo MATSUDA, Plaintiff,**

v.

**Michiko WADA, Defendant.**

**No. CIV. 98–756 ACK.**

United States District Court,
D. Hawai'i.

Oct. 3, 2000.

Nenad Krek, Carlsmith Ball LLP, Honolulu, HI, for Hideo Matsuda, plaintiffs.

Carl H. Osaki, Honolulu, HI, for Michiko Wada, defendants.

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS

KAY, District Judge.

### BACKGROUND

Hideo Matsuda ("Plaintiff") is the owner of the racing yacht Big Apple III ("the yacht"). Both Plaintiff and Michiko Wada ("Defendant") are citizens of Japan. Defendant is also a permanent resident alien residing in Hawaii. All parties agree that Plaintiff hired Defendant to help him in some capacity with his campaign to win the 1998 Kenwood Cup; the dispute is over how much compensation Defendant was promised for her services and what damages Plaintiff is owed from Defendant's tortious attempts to collect by willfully withholding the bill of lading for the yacht. Defendant alleges that she performed various services which contributed to the success of the yacht pursuant to a contract with Plaintiff. According to Plaintiff, Defendant's services included acting as a translator and interpreter. *See* Compl., at 2. According to Defendant, her services included overseeing the design, construction, launching, optimization, and participation in three regattas, acting as a personal assistant, and acting as a liaison between Plaintiff and various English-speaking companies and individuals. *See* Counterclaim, at 2–3. All agree that Plaintiff paid Defendant $12,000 for her services. Defendant, however, believes she was owed additional compensation for her services and presented Plaintiff with an invoice for her services of $83,954.[1] Plaintiff refused to pay.

At the conclusion of the race, Plaintiff arranged for the transportation of the yacht from Hawaii to Japan. The shipping company issued a Bill of Lading for the yacht. It is undisputed that Defendant obtained possession of the original Bill of Lading after the dispute regarding her alleged compensation arose. She then refused to release the Bill of Lading unless Plaintiff paid in full her claim for the compensation allegedly due to her for the services performed. Because of Defendant's refusal to surrender the Bill of Lading, Plaintiff had to post a bond in the amount of the value of the yacht in order to receive delivery of the yacht from the ocean carrier. Plaintiff then sought to recover the Bill of Lading through this action.

Plaintiff filed his Complaint on September 15, 1998.[2] The Complaint set forth claims for Petitory and/or Possessory Relief of the Bill of Lading (Count I), Conversion (Count II), Replevin (Count III), Declaratory Relief (Count IV), Injunctive Relief (Count V), Fraud (Count VI), and Punitive Damages (Count VII). Plaintiff asserted jurisdiction under admiralty, 28 U.S.C. § 1333(1), diversity between a citizen of a State and a citizen of a foreign state, 28 U.S.C. § 1332(a)(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201.

Defendant filed a First Amended Counterclaim ("Counterclaim") on March 18, 1999. The Counterclaim set forth claims for Breach of Contract (Count I), Punitive Damages (Count II), and Unjust Enrichment (Count III).

In an Order filed August 4, 1999 ("Partial SJ Order"), this Court granted in part

---

**1.** This amount was based on Defendant's claim that under the contract between her and Plaintiff, she was owed 10% of total boat expenditures ($959,540), i.e., $95,954. Defendant then subtracted the $12,000 she had already been paid and demanded the balance of $83,954.

**2.** Plaintiff moved to amend the Complaint to state a claim *in rem* against the Bill of Lading under Count I. Magistrate Judge Barry M. Kurren granted Plaintiff's motion in an order filed on December 30, 1998. Before Plaintiff filed an amended complaint, however, Defendant surrendered the Bill of Lading, obviating the need to amend the Complaint. An amended complaint was never filed.

and denied in part Plaintiff's motion for partial summary judgment. As part of its analysis, the Court examined whether the claims at issue in the motion (Counts II, VI, and VII) sat in admiralty or diversity jurisdiction. The Court concluded that it "has jurisdiction *over the claims at issue in the instant motion* not under its admiralty jurisdiction, but instead under its diversity jurisdiction." Partial SJ Order, at 7–8 (emphasis added). In reaching this conclusion, the Court only analyzed the test for admiralty jurisdiction; once it concluded that admiralty jurisdiction for those claims was lacking, it presumed diversity jurisdiction existed because Defendant did not challenge Plaintiff's diversity jurisdiction. Summary judgment was then granted to Plaintiff on his claim for conversion of the Bill of Lading, but denied to Plaintiff on his claim for fraud and punitive damages. The Court also held that Defendant's claim for punitive damages was moot.

Trial was set for September 7, 2000. In a motion filed on August 23, 2000, Defendant moved to dismiss the case for lack of subject matter jurisdiction. Plaintiff filed an opposition on August 28, 2000. In addition to opposing the motion, Plaintiff requested that the Court award him attorneys' fees and costs for the time spent on the opposition, the timing of which he labeled "outrageous." Opp., at 22. Defendant filed a reply on August 30, 2000. A hearing was held on the matter on September 1, 2000.

### STANDARD OF REVIEW

 "A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." *See Thompson v. McCombe,* 99 F.3d 352, 353 (9th Cir.1996). On a Rule 12(b)(1) motion, the court is not "restricted to the face of the pleadings, but may re-view any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir.1988). "The requirement that the nonmoving party present evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction is the same as that required under Rule 56(e) that the nonmoving party to a motion for summary judgment must set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exists." *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.,* 813 F.2d 1553, 1559 (9th Cir.1987); *see also Biotics Research Corp. v. Heckler,* 710 F.2d 1375, 1379 (9th Cir.1983) (noting that the district court may receive evidence to resolve underlying factual disputes in a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction).

### DISCUSSION

 This Court is a court of limited subject matter jurisdiction and must ensure that the matter at hand is properly before it. "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *See Stock West, Inc. v. Confederated Tribes,* 873 F.2d 1221, 1225 (9th Cir.1989). The burden is on Plaintiff to show that jurisdiction exists. Subject matter jurisdiction is determined and must exist at the time the complaint is filed. *See Morongo Band of Mission Indians v. California State Bd. of Equalization,* 858 F.2d 1376, 1380 (9th Cir. 1988) (looking to original complaint, and not amended complaint, for subject matter jurisdiction); *see also Carney v. Resolution Trust Corp.,* 19 F.3d 950, 954 (5th Cir.1994).[3] Defendant filed the instant motion two weeks before trial was set to begin and almost two years after the Com-

---

**3.** That this is the case is further supported by the supplemental jurisdiction statute found at 28 U.S.C. § 1367(c). Under that section, a district court *may* decline jurisdiction to a claim over which it lacks original jurisdiction if it has dismissed all claims over which it had original jurisdiction. If subject matter jurisdiction was reassessed after each individual claim was dismissed, there would be no need for this permissive rule.

plaint was filed in this case. Although it was indeed the eleventh hour before trial when Defendant filed the instant motion, the Court must examine the issue. "A party may question the existence of subject matter jurisdiction at any time during the proceedings." *Yang v. Shalala,* 22 F.3d 213, 216 n. 4 (9th Cir.1994); *see also* Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). Plaintiff asserts that jurisdiction is proper under various bases: diversity, admiralty, and supplementary. The Court will discuss each in turn.[4]

## I. Diversity Jurisdiction

Plaintiff claims that he has jurisdiction through diversity. The requirements for diversity jurisdiction are set forth in 28 U.S.C. § 1332:

> (a) The district courts shall have original jurisdiction of all civil actions where *the matter in controversy exceeds the sum or value of $75,000,* exclusive of interest and costs, *and is between-*
>> (1) citizens of different States;
>> (2) *citizens of a State and citizens or subjects of a foreign state;*
>> (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
>> (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.
>
> *For the purposes of this section, section 1335, and section 1441, an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.*

28 U.S.C. 1332(a) (emphasis added). The Court will examine separately the "amount

in controversy" and "diversity of citizenship" requirements.

## A. Amount in Controversy

To have diversity jurisdiction, the amount in controversy must exceed $75,000.00. *See* 28 U.S.C. § 1332(a). The Court finds that Plaintiff easily satisfies this requirement.

■ "[W]here a plaintiff seeks injunctive or declaratory relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *International Gateway Communications, Inc. v. Communication Telesystems Int'l, Inc.,* 922 F.Supp. 122, 124–25 (N.D.Ill.1996); *see also* 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3708 ("it is well-settled that the amount in controversy is said to be measured for subject matter jurisdiction purposes by the value of the right that the plaintiff seeks to enforce or to protect against the defendant or the value of the object that is the subject matter of the action"). In *International Gateway,* the object of the suit was to escape from liability under a contract. The court held that the "value of the relief, therefore, is measured by the liability that will follow if the contract is valid and enforceable." *Id.* at 125. The plaintiff's potential liability under the contract was $179,133. The court stated, "The Court finds dubious plaintiff's argument that the amount in controversy here is zero. Clearly, if the contract ... is enforceable, plaintiff may be liable to CTS for up to $179,144." *Id.*

■ The instant situation is analogous to *International Gateway.* In Count IV of the Complaint, Plaintiff requested declaratory judgment that "Defendant is not owed $83,954.00, or any other amount, by Plain-

---

4. Plaintiff also asserted jurisdiction under the Declaratory Judgment Act ("DJA"). *See* Compl., at 2. The DJA, 28 U.S.C. § 2201, only creates a remedy and is not an independent basis for jurisdiction. *See Stock West,* 873

F.2d at 1225. To obtain declaratory relief in federal court, there must be an independent basis for jurisdiction, such as admiralty or diversity.

tiff." Compl., at 5. This declaration would have required the Court to find that Plaintiff did not have a contract with Plaintiff whereby he would pay her 10% of the total expenditures spent on the yacht. *See id.*, at 3. As with the plaintiff in *International Gateway* who sought declaratory relief to escape from liability under a contract, Plaintiff herein sought declaratory relief to escape liability under the alleged oral contract with Plaintiff for compensation. Here too, therefore, the value of the relief should be measured by the liability that will follow if the contract is valid and enforceable—$83,954.00. The Court finds that the value of the relief Plaintiff sought exceeds the jurisdictional minimum.

## B. Diversity of Citizenship

 Article III of the Constitution establishes the outer boundaries of federal court jurisdiction.

The judicial Power shall extend to ... Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, *and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.*

U.S. Const. Art. III, § 2 (emphasis added). While Congress may grant the federal courts jurisdiction over fewer cases than authorized under Article III, it may not expand federal courts' jurisdiction beyond Article III. *See, e.g., Verlinden B.V. v. Central Bank,* 461 U.S. 480, 491, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Hodgson v. Bowerbank,* 9 U.S. (5 Cranch) 303, 303, 3 L.Ed. 108 (1809). Under the plain language of Article III, federal courts lack jurisdiction over actions by one foreign citizen or subject against another. *See Hodgson,* 9 U.S. (5 Cranch) at 303 (finding no jurisdiction over action between two aliens); *Arai v. Tachibana,* 778 F.Supp. 1535, 1538 (D.Haw.1991) (Ezra, J.) ("the federal judicial power cannot extend to cases involving solely aliens"). Thus, Congress is powerless to create jurisdiction where Article III does not authorize it, such as in suits solely between citizens or subjects of foreign states.

The question has arisen, however, whether the general bar on jurisdiction over actions by one alien against another means that federal courts lack jurisdiction over suits between a non-resident alien and a permanent resident alien. Federal courts have diversity jurisdiction over actions between "citizens of a State and citizens or subjects of a foreign state." *See* 28 U.S.C. § 1332(a)(2). Moreover, the diversity statute states that "[f]or the purposes of [§ 1332(a)] ... an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled." 28 U.S.C. § 1332(a) ("the deeming clause"). Under the plain language of the diversity statute, therefore, there is diversity of citizenship between a permanent resident alien (insofar as she is deemed a citizen of the state in which she is domiciled) and non-resident aliens. Some courts have expressed concern over this reading, however, because of its apparent conflict with the bar on jurisdiction over actions by one foreign citizen or subject against another. *See, e.g., Arai,* 778 F.Supp. at 1540–41. The Ninth Circuit has not considered whether there is diversity of citizenship between an alien who resides in a foreign country (i.e., Plaintiff) and an alien who is a lawful permanent resident of the United States (i.e., Defendant). The courts that have considered the issue, including one in this district, are split. After a brief discussion of statutory construction techniques, this Court will look at each side of the issue.

### 1. Statutory Construction

 In cases involving statutory construction, the starting point must be the language employed by Congress. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). A court should assume that the

legislative purpose is expressed by the ordinary meaning of the words used and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.* (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (changes in original)); *see also In re Cervantes,* 219 F.3d 955, 960–61 (9th Cir.2000) ("while the plain language of a statute is not always conclusive, we ignore plain language only when a 'literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result.' "). However, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (noting that this "cardinal principle . . . has for so long been applied by this Court that it is beyond debate"); *accord Rattray v. City of National City,* 51 F.3d 793, 798 (9th Cir.1994) ("We therefore construe the statute, as we must, to avoid this constitutional issue."). The *DeBartolo* Court explained that,

> This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.

5. 28 U.S.C. § 1332(a)(2) currently gives the district courts diversity jurisdiction over actions between citizens of a State and citizens or subjects of a foreign state. Diversity jurisdiction exists under this provision even though the alien may have been admitted to the United States as a permanent resident. As any review of the immigration statistics indicates, large numbers of persons fall within this category.

*Id.* With these principles in mind, the Court now turns to the case law on this issue.

**2. Case Law**

The Court begins with *Arai,* a decision penned by another judge in this district and apparently the first case to ponder this issue. In *Arai,* a Japanese corporation and a Japanese non-resident alien sued a Hawaii corporation and two Japanese permanent resident aliens of Hawaii. *See* 778 F.Supp. at 1536. The court concluded that the diversity statute should be read such that there is no diversity in suits between two aliens (even if one is a permanent resident) because to allow such a suit would be both against the intent of the deeming clause drafters and unconstitutional. *See id.* at 1540–43. In reaching this conclusion, the court examined the origin of the deeming clause. *See* Judicial Improvements and Access to Justice Act, Pub.L. 100–702, § 203(a). The court noted that the amendments to the diversity statute were generally designed to combat rising federal court case loads by reducing diversity jurisdiction. The court observed that a plain language reading of the diversity statute would increase case loads in federal court and thereby conflict with the drafters' goals. *See* 778 F.Supp. at 1541. The court also noted that the only legislative history directly commenting on the deeming clause explained that the legislation was needed in order to eliminate federal court jurisdiction for essentially local disputes between a citizen of State A and an alien permanently residing in State A.[5] In other words, the rationale behind the clause was to force permanent resident aliens suing American citizens who reside

> *There is no apparent reason why actions between persons who are permanent residents of the same State should be heard by Federal courts merely because one of them remains a citizen or subject of a foreign state.*

134 Cong. Rec. S16284–01, § 203.

in their states to sue in state court. This goal is consistent with the goal to reduce federal court case loads.

The Third Circuit has also addressed the issue. *See Singh v. Daimler–Benz AG*, 9 F.3d 303, 304 (3d Cir.1993). The case in *Singh* was between a permanent resident alien and two defendants, one of whom was an American citizen and one of whom was a nonresident alien. The court first looked at the statutory language and found "no ambiguity" in the language of § 1332(a). *See id.* at 306 ("the [deeming clause] represents a straightforward congressional direction"). Although the court believed that, "[b]ecause the statutory language is plain, [its] inquiry should be complete," it did look to the legislative history upon a party's objection. *Id.* After examining the legislative history (much of which was the same examined by the *Arai* court), the Third Circuit's conclusion was that the legislative history was inconclusive. *See id.* at 309 ("In short, while we agree ... that there is nothing in the legislative history ... that suggests that Congress intended the permanent resident alien provision to expand diversity jurisdiction, there is also nothing to support Singh's view that the entire 1988 Act was characterized by a 'clarity of purpose' to reduce diversity jurisdiction. Instead the Act is more accurately viewed as Senator Heflin described it, 'a noncontroversial judicial improvements bill with many authors.' ") (citations omitted). The court concluded that it "must construe this as written, particularly because the legislative history does not provide an overriding reason not to do so." *Id.* at 310. Finally, although the Third Circuit recognized there might be constitutional problems with its plain language interpretation in some cases (such as a lawsuit between a permanent resident alien and a non-resident alien), it found that the plain language interpretation posed no constitutional problem in the case before it because one party was an American citizen, thereby satisfying minimal diversity. *See id.* at 311–12.

The only other circuit court to analyze the issue was the District of Columbia Circuit in *Saadeh v. Farouki*, 107 F.3d 52 (D.C.Cir.1997). The *Saadeh* court held that the district court lacked subject matter jurisdiction in diversity over a lawsuit filed by non-resident alien creditor (Saadeh) against a permanent resident alien debtors (Mr. and Mrs. Farouki). *See id.* at 53–54. The court recognized that the plain language of § 1332 would create diversity between Saadeh and Mr. and Mrs. Farouki. *See id.* at 55. Nevertheless, it stated,

A literal reading of the 1988 amendment to § 1332(a) would produce an odd and potentially unconstitutional result. It would ... create federal diversity jurisdiction over a lawsuit brought by one alien against another alien, without a citizen of a state on either side of the litigation. The judicial power of the United States does not extend to such an action under the Diversity Clause of Article III.

*Id.* at 58. The court then turned to the legislative history. The court first found an intention by legislators to change the fact that a dispute between a permanent resident alien and a U.S. citizen in the same state could always get into federal court through diversity jurisdiction. *See id.* at 58–59. This problem was solved by the deeming clause treating the permanent resident alien as a citizen of his state of residence, thereby destroying diversity jurisdiction. The court also found a desire by legislators to reduce the federal courts' caseloads in general by restricting use of diversity. The court then held that the plain language reading of the statute, which would create previously non-allowable jurisdiction between aliens, was at odds with Congress's intention to shrink diversity jurisdiction. *See id.* at 60 ("we do not view these concerns about the workload of the federal judiciary and the burdens imposed by diversity jurisdiction as consistent with the conclusion that Congress intended what a literal reading of

the statute suggests"). The court summarized its holding as follows: "[T]he 1988 amendment to § 1332 did not confer diversity jurisdiction over a lawsuit between an alien on one side, and an alien and a citizen on the other side, *regardless of the residence status of the aliens.*" *Id.* at 61 (emphasis added); *accord China Nuclear Energy Indus. Corp. v. Arthur Andersen, LLP,* 11 F.Supp.2d 1256, 1258 (D.Colo. 1998) (noting that the deeming clause was passed as part of an effort to reduce diversity case loads and rejecting a plain language reading of § 1332(a), the court wrote that "[I]f applied as written the amendment authorizes jurisdiction in cases where neither party is a citizen of the United States.... [This is] a clear imposition on Article III's limitation of federal court jurisdiction.").

### 3. The Court's Conclusion

▮ All of the cases begin their analysis by determining the plain language of the statute, as directed by *American Tobacco.* All found, as this Court did above, that under the plain language of § 1332(a), there is diversity jurisdiction between a permanent resident alien and non-resident aliens.

*Arai* and *Saadeh* held that the plain language could not govern, however, because it created a result (expanding diversity jurisdiction) that was contrary to a clearly expressed legislative intent (curbing diversity jurisdiction). The Court agrees with *Arai* and *Saadeh* that Congress was trying to reduce the cases brought under diversity when it drafted the deeming clause. It also agrees with those courts that this goal would be frustrated somewhat if, under the plain language of § 1332(a), diversity jurisdiction between a permanent resident alien and non-resident aliens that did not lie pre-amendment suddenly existed.

More significantly, however, the Court agrees with *Arai* and *Saadeh* that the plain language interpretation of § 1332(a) raises serious constitutional problems that could be avoided with another construction. Regardless of the modifying phrase "permanent resident," a permanent resident alien is still just that—an alien. Article III does not provide for diversity jurisdiction between aliens. *See Hodgson,* 9 U.S. (5 Cranch) at 303; *Arai,* 778 F.Supp. at 1538. It follows that Congress may not create such jurisdiction by statute because it would go beyond the boundaries of federal court jurisdiction set by Article III. *See, e.g., Verlinden,* 461 U.S. at 491, 103 S.Ct. 1962. Under *DeBartolo,* the Court should construe a statute so as to avoid an unconstitutional reading unless the alternate construction is plainly contrary to the intent of Congress. The other feasible construction of § 1332(a) is that the deeming clause only exists to avoid granting diversity jurisdiction to permanent resident aliens when they sue U.S. citizens who live in the same state. This rationale is clearly not "plainly contrary" to the intent of Congress—unlike the plain language reading, this construction curbs diversity jurisdiction, which is what Congress wanted to accomplish with the deeming clause. This construction is also consistent with the legislative history, in which the only expressed rationale for the deeming clause was to avoid granting diversity jurisdiction to permanent resident aliens when they sue U.S. citizens who live in the same state.

In conclusion, although the Court finds that the plain language of § 1332(a) would confer diversity jurisdiction on the instant case, the Court must adopt the alternative construction of § 1332(a) so as to avoid an unconstitutional reading of the statute. Under this reading, there is no diversity of citizenship between permanent resident aliens and non-resident aliens. Accordingly, despite having the jurisdictional minimum in controversy, the Court finds that Plaintiff cannot rely on diversity jurisdiction to bring the instant action against Defendant.

## II. Admiralty Jurisdiction

Plaintiff alternatively asserts admiralty as the basis for subject matter jurisdiction. 28 U.S.C. § 1333(1) states, in relevant part,

> The district courts shall have original jurisdiction, exclusive of the courts of the States, of (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

The Court has already held that it lacks admiralty jurisdiction over Counts II, VI, and VII. *See* Partial SJ Order, at 7–8. The issue before the Court now is whether it had admiralty jurisdiction over any of the other counts (I, III, IV, or V) in the Complaint when it was filed. At the time Plaintiff filed the Complaint, Defendant (or possibly, her attorney) was in possession of the Bill of Lading. The Bill of Lading has since been returned to Plaintiff, arguably mooting certain of Plaintiff's claims.[6] As explained above, however, the mootness (if any) of the Plaintiff's claims is irrelevant for purposes of determining subject matter jurisdiction. *See Morongo*, 858 F.2d at 1380. The Court now examines whether there is admiralty jurisdiction over any of Counts I, III, IV, or V.

Defendant argues that there is no admiralty jurisdiction. Defendant's motion did not persuade the Court that admiralty jurisdiction is lacking. Defendant's argument appears to be that regardless of Plaintiff's enumerated claims, Plaintiff's "fundamental claim" is for conversion and there is no admiralty jurisdiction for his conversion claim. Defendant cites both the district court and First Circuit opinions in *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 806 F.Supp. 291 (D.Mass.1992), *vacated and remanded*, 4 F.3d 90 (1st Cir.1993), at length to support this position. Although the Court agrees (and has already held that) there is no admiralty jurisdiction over Plaintiff's conversion claim, *see* Partial SJ Order, at 7–8, this argument fails. The issue before the Court today has nothing to do with whether a court examining a claim for conversion can sit in admiralty. Both *Evergreen* cases are irrelevant. Moreover, it is beside the point what Defendant thinks Plaintiff's "fundamental claim" is—the Court must look at each of Plaintiff's individual claims and see if it has jurisdiction over any of them—it cannot simply focus on the claim Defendant conveniently labels "fundamental." Although the Court concludes that Defendant has not shown that admiralty jurisdiction is lacking, the burden is on Plaintiff to establish that he has subject matter jurisdiction. The Court will now turn to Plaintiff's arguments.

Plaintiff argues that the Court had admiralty jurisdiction over his claim for Petitory and/or Possessory Relief of the Bill of Lading (Count I). In Count I, Plaintiff prayed for relief awarding him possession of the Bill of Lading for the yacht pursuant to Rule D [7] of the Supplemental Rules for Certain Admiralty and Maritime Claims. *See* Compl., at 5.

---

**6.** Specifically, Defendant argues that what she calls the "Replevin Counts" (Counts I, III, IV, and V) are moot because of the return of the Bill of Lading to Plaintiff. Defendant does not explain how all of Count IV is moot simply because the Bill of Lading has been returned. Count IV seeks, *inter alia*, declaratory relief that Defendant is not owed $83,954.00. This issue was not resolved by the return of the Bill of Lading.

**7.** In all actions for possession, partition, and to try title maintainable according to the course of the admiralty practice with respect to a vessel, in all actions so maintainable with respect to the possession of cargo or other maritime property, and in all actions by one or more part owners against the others to obtain security for the return of the vessel from any voyage undertaken without their consent, or by one or more part owners against the others to obtain possession of the vessel for any voyage on giving security for its safe return, the process shall be by a warrant of arrest of the vessel, cargo, or other property, and by notice in the manner provided by Rule B(2) to the adverse party or parties.
Fed.R.Civ.P. Supp. R. Adm. & Mar. Claims, Rule D.

"A petitory suit is an action to try title to a vessel. In order to bring a petitory suit, the Plaintiff must assert legal title to the vessel." *Privilege Yachting, Inc. v. Teed*, 849 F.Supp. 298, 301 (D.Del. 1994). "A possessory action permits a party to adjudicate the right to possession of property that has been wrongfully taken." *Id.* It is well settled that the admiralty jurisdiction of federal courts extends to petitory and possessory suits concerning vessels. *See Ward v. Peck*, 59 U.S. (18 How.) 267, 267, 15 L.Ed. 383 (1855) ("In this country ... the ancient jurisdiction over petitory suits or causes of property has been retained [by courts of admiralty]."); *Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, Hull No. 01*, 625 F.2d 44, 47 (5th Cir.1980) (finding admiralty jurisdiction over petitory cause of action by plaintiffs who asserted legal title to the vessel, the right to immediate possession, and that an unlawful taking and detention had been done by the defendant); *Gallagher v. Unenrolled Motor Vessel River Queen*, 475 F.2d 117, 119 (5th Cir.1973) ("it is a fundamental principle that admiralty has jurisdiction in a possessory suit by the legal owner of a vessel who has been wrongfully deprived of possession") (quotation marks and alterations omitted) (owner of a pleasure boat, who asserted legal title to the vessel and he alleged he was divested of possession by the act of an extrinsic source, stated possessory claim); *Kawa Leasing, Ltd. v. Yacht Sequoia*, 544 F.Supp. 1050, 1063, 1065 (D.Md.1982) ("plaintiffs' within prayers for relief would appear petitory in nature, which in turn means that admiralty jurisdiction is present") (suit *in rem* to clear cloud on title of vessel); *Hunt v. A Cargo of Petroleum Products Laden on the Steam Tanker Hilda*, 378 F.Supp. 701, 703–04 (E.D.Pa.1974) ("The nature of these actions and their recognition as part of admiralty jurisdiction of this country has been well established since Justice Story's decision sitting as a Circuit Justice in *The Tilton* ....."); *Atamanchuck v. Atamanchuck*, 61 F.Supp. 459, 460 (D.N.J.1945) ("Possessory suits

may be brought in Admiralty in all cases to reinstate the owners of ships who have been wrongfully deprived of their property.") (suit *in rem* for possession of a vessel allegedly taken under a forged bill of sale); *The Tietjen & Lang No. 2*, 53 F.Supp. 459, 461 (D.N.J.1944) (court found admiralty jurisdiction in suit by owner of ship to regain possession of ship and equipment which allegedly was wrongfully taken and to which she had legal title).

Merely using the catch words "petitory" and "possessory" will not confer admiralty jurisdiction, however. *See Privilege Yachting*, 849 F.Supp. at 301–02 (plaintiff was really asserting a breach of contract claim and could not obtain admiralty jurisdiction merely by invoking Rule D without showing entitlement to make petitory or possessory claims). A plaintiff must claim either legal title to the vessel (for a petitory suit) or that the vessel was wrongfully taken (for a possessory action). *See id.* Moreover, merely invoking Rule D does not create admiralty jurisdiction. *See, e.g., id.; Cary Marine, Inc. v. The Motorvessel Papillon*, 872 F.2d 751, 754, 756–57 (6th Cir.1989) (only if a case is subject to admiralty jurisdiction is resort to the remedy under Rule D available); *Silver v. The Sloop Silver Cloud*, 259 F.Supp. 187, 189–90 (S.D.N.Y.1966) (same). Finally, while many of the petitory and possessory claims in the aforementioned cases were brought *in rem*, there does not appear to be a requirement that such claims be brought *in rem*. Defendant has not cited, and the Court has not found, any authority that such a proposition is true. *See, e.g., Ward*, 59 U.S. (18 How.) at 267 (suit *in personam* only); *Pasternack v. Lubetich*, 11 Wash. App. 265, 522 P.2d 867, 869 (1974) ("if the suit is *in personam*, a claimant may elect to bring the action either in admiralty or, because of the savings [to suitors] clause, in a state court by ordinary civil action"); *see also O.F. Shearer & Sons, Inc. v. Decker*, 349 F.Supp. 1214, 1218 (S.D.W.Va.1972) (plaintiff brought an *in personam* possessory suit in state court and federal court

noted that "plaintiff, had it so desired, could have brought this action for recovery of the ship's propeller in a federal district court under its admiralty jurisdiction"). There is certainly no requirement that all maritime claims be filed *in rem. See Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054 (9th Cir.1997) ("[A] plaintiff with *in personam* maritime claims has three choices: He may file suit in federal court under the federal court's admiralty jurisdiction, in federal court under diversity jurisdiction if the parties are diverse and the amount in controversy is satisfied, or in state court."); *Pasternack*, 522 P.2d at 871 (explaining that the difference between *in rem* and *in personam* suits is how broadly the adjudication has effect).

■ Possessory and petitory suits may be used for more than vessels; they may also be used to recover a bill of lading and the cargo covered by the bill of lading. For example, in *Thypin Steel Co. v. Asoma Corp.*, 215 F.3d 273, 282–83 (2d Cir. 2000), a possessory suit was used to recover the bill of lading (and the cargo covered by the bill of lading). The Second Circuit held that the bills of lading issued to transport goods over navigable waters are maritime contracts and that, therefore, disputes over parties' entitlement to the bill of lading may be heard in admiralty. *See id.* at 278. The *Thypin* court then approved of the plaintiff's use of Rule D to arrest the bill of lading via a possessory suit. *See id.* at 282–83. This holding is consistent with the holding in *Hunt*, 378 F.Supp. at 703–04, that while courts have admiralty jurisdiction over petitory or possessory claims as to vessels regardless of the presence of a maritime contract or maritime tort, they do not have admiralty jurisdiction over such claims as to cargo unless the questions about the cargo's title or possession is based on a maritime contract or bears a significant relationship to maritime commerce. It is also consistent with the holding in both *Cary Marine*, 872 F.2d at 756–57, and *Silver*, 259 F.Supp. at 189–90, that Rule D does not create admiralty jurisdiction, but instead, remedy under Rule D is only available if a case is otherwise subject to admiralty jurisdiction. In *Thypin* there was a maritime contract—the bill of lading for the cargo. Accordingly, there was admiralty jurisdiction and a possessory suit and the use of the procedures under Rule D was appropriate. *See Thypin*, 215 F.3d at 282–83.

■ The Court now applies the above rules to the instant case. Count I of the Complaint sought immediate possession of the Bill of Lading under Rule D. Plaintiff therefore purported to assert a possessory suit against Defendant to obtain the return of the Bill of Lading. Under *Thypin*, a possessory suit may be used to recover a bill of lading when the bill of lading is a maritime contract, i.e., when admiralty jurisdiction exists. The Bill of Lading in the instant case was a maritime contract because it was issued to transport goods (the yacht) over the navigable waters from Hawaii to Japan. *See Thypin*, 215 F.3d at 278. Accordingly, a possessory suit is stated if Plaintiff asserted in the Complaint that the Bill of Lading had been wrongfully taken from him by Defendant's conversion. *See Privilege Yachting*, 849 F.Supp. at 301–02. Plaintiff did so. *See* Compl., at 4–5. The Court therefore finds that Plaintiff's claim for a possessory suit for the Bill of Lading in his Complaint sounded in admiralty. Accordingly, the Court concludes that Count I of the Complaint asserted a claim under the Court's admiralty jurisdiction.

## III. Supplemental Jurisdiction

The Court has admiralty jurisdiction over Count I of the Complaint. It must now decide whether to exercise supplemental jurisdiction over those claims upon which it lacks original jurisdiction. Because of its conclusion regarding diversity jurisdiction, the Court assumes that it lacks original jurisdiction over Counts II–VII.

■ "Supplemental jurisdiction," codified at 28 U.S.C. § 1367, allows a district court which has jurisdiction over a federal claim to also maintain jurisdiction over related claims and parties over which it otherwise would lack jurisdiction:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts *shall* have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a); *see also Executive Software N. Am. Inc. v. United States Dist. Ct.,* 24 F.3d 1545, 1555 (9th Cir.1994). This rule clearly applies when the basis of a federal court's jurisdiction over some of the claims before it is admiralty. *See Robert E. Blake, Inc. v. Excel Environmental,* 104 F.3d 1158, 1162 (9th Cir.1997). Once a district court concludes that supplemental jurisdiction is proper under § 1367(a), it *may* decline to exercise supplemental jurisdiction if, *inter alia,* "the district court has dismissed all claims over which it has original jurisdiction." *See* 28 U.S.C. § 1367(c)(3). The usual rule in this circuit is that when "federal claims are dismissed before trial ... pendant [sic] state claims also should be dismissed." *Jones v. Community Redevelopment Agency,* 733 F.2d 646, 651 (9th Cir.1984). Retention of jurisdiction is discretionary, however. When deciding whether or not to decline supplemental jurisdiction under the § 1367(c) factors, a court's decision should consider the values of economy, convenience, fairness, and comity. *See Executive Software,* 24 F.3d at 1557.

In the instant case, the Court has original jurisdiction over only Count I of the Complaint. It seems uncontroversial that Counts II–VII are so related to Count I that they form part of the same case or controversy—all the counts relate to Defendant's demand for extra compensation and Plaintiff's damages resulting from Defendant taking the bill of lading. Accordingly, it was proper, under § 1367(a), for this Court to exert supplemental jurisdiction over Plaintiff's non-admiralty claims at the time the Complaint was filed.

■ Although, the mootness of Count I seems apparent [8], as of this time, Count I has not been dismissed, as no motion to dismiss has been presented to the Court other than the instant one based on subject matter jurisdiction. Technically, therefore, this is not a situation whereby § 1367(c)(3) allows a district court to decline to exercise supplemental jurisdiction. Even if the Court assumes that Count I is moot and it has discretion to decline to exercise supplemental jurisdiction over the other counts, however, the Court would retain jurisdiction. Weighing the factors discussed in *Executive Software,* 24 F.3d at 1557, the Court finds that the values of economy, convenience, and fairness all favor this Court's retention of jurisdiction. It would be grossly wasteful of judicial resources for the Court to dismiss the other claims when the case has been before this Court almost two years and is less than a week from the trial date. The Court has adjudicated a motion for partial summary judgment. Moreover, the parties have done much of their pretrial work and have started to make arrangements to be present for trial. Dismissing the claims now and sending the parties to another venue would add years to a case that is already two years old. Furthermore, declining supplemental jurisdiction now would be especially unfair to Plaintiff—although Defendant has the right to challenge jurisdiction at any time in the proceedings, Defendant's eleventh hour motion should not be encouraged as a way for a party to avoid trial at the last second if

---

**8.** All Count I seeks is possession of the Bill of Lading and Plaintiff now has possession of the Bill of Lading. *See* Compl., at 4–5; Opp., at 2.

all other avenues of defense have failed. Defendant has not explained her failure to raise this issue sooner before all parties concerned had invested so much energy and time and money into the lawsuit in federal court. Indeed, in her July 11, 2000 Second Pretrial Statement Defendant wrote that she "questions this Court's subject-matter jurisdiction," yet a month and a half passed before a motion to dismiss for lack of subject matter jurisdiction was filed. For all of these reasons, the Court in its discretion will exercise supplemental jurisdiction over Counts II–VII of the Complaint.

## IV. Attorneys' Fees

█ Plaintiff requests attorneys' fees in the amount of the "fees and costs to Plaintiff that were wasted on the prosecution of this action." Opp., at 22. Although the Court shares Plaintiff's dismay and exasperation with the lateness of the motion to dismiss, it denies the request for fees.

First, Plaintiff complains that Defendant has litigated the case for 23 months without raising a subject matter jurisdiction claim. While this is true, Defendant's current counsel has only been retained since February of 2000. This fact cuts against the idea that Defendant has been sitting on this "insurance policy" just waiting until there were no other ways to avoid trial. Moreover, as the mixup about Defendant's citizenship [9] shows, her prior attorney was not very diligent in getting the jurisdictional facts straight.

Plaintiff also appears to argue that Defendant's diversity argument is frivolous because *Singh* is the only appellate decision on point and is in favor of jurisdiction. This argument is both factually incorrect (as the District of Columbia Circuit issued its opinion on the matter in *Saadeh* in 1997) and, considering that the Court found in Defendant's favor on the diversity question, without merit.

Finally, Plaintiff argues that Defendant's counsel has been considering this motion at least since an April letter which questioned jurisdiction, implying improper delay in bringing this motion. *See* Opp., at 24–25 & Ex. A, at 5–7. If Defendant had raised his more plausible jurisdictional arguments about the lack of diversity or admiralty jurisdiction in the April letter, the Court might be persuaded that Defendant had engaged in undue delay. Yet, the only jurisdictional issue Defendant raised in the letter was the idea that maybe the amount in controversy was insufficient. Plaintiff's argument that Defendant knew of more arguable bases for the motion in April and dallied in making the instant motion is unsupported.

For all of these reasons, the Court finds Plaintiff's arguments as to why he deserves attorneys' fees unconvincing and DENIES the request.

### CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion to Dismiss.

IT IS SO ORDERED.

---

**9.** Defendant's prior attorney, in the Answer, admitted as true the Complaint's contention that Defendant was a U.S. citizen.